UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

BENTON DIVISION

| | |
|---|---|
| Stacy Sumner, individually and on behalf of all others similarly situated, | 3:22-cv-01950 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| The Kroger Co., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. The Kroger Co. ("Defendant") manufactures, markets, labels, and sells coffee whitener identified as a coffee creamer that has been "ultra-pasteurized" under the Kroger brand ("Product").

I. **DAIRY PRODUCTS AND COFFEE**

2. Coffee drinkers often add dairy products, ranging from skim milk to heavy cream, to soften this beverage's naturally strong taste.

3. Google Dictionary defines cream as "the thick white or pale yellow fatty liquid which rises to the top when milk is left to stand."

4. Merriam-Webster defines cream as the "yellowish part of milk containing from 18 to about 40 percent butterfat."

5. The Britannica Dictionary defines cream as "the thick part of milk that rises to the top; the part of milk that contains fat."

6. Collins Dictionary defines cream as "a thick yellowish-white liquid taken from

milk."

7. Dictionary.com defines cream as "the fatty part of milk, which rises to the surface when the liquid is allowed to stand unless homogenized."

8. The Food and Drug Administration ("FDA") and identical State regulations, define cream as "the liquid milk product high in fat separated from milk, [with] not less than 18 percent milkfat." 21 C.F.R. § 131.3(a).

9. Coffee cream, also called light cream, is a specialized dairy product made for whitening coffee, "which contains not less than 18 percent but less than 30 percent milkfat," with added sweeteners and/or flavorings. 21 C.F.R. § 131.155(a).

## II. NON-DAIRY COFFEE WHITENERS

10. Non-dairy coffee whiteners were introduced in the 1960s.

11. These products distinguished themselves in several ways from cream made from dairy ingredients.

12. First, they were sold under the generic name, "coffee whiteners."

13. Second, they were stocked in the frozen food sections of grocery stores.

14. In contrast, coffee cream and other dairy products were sold in the refrigerated foods section in the dairy case.

15. Third, the front label of these products prominently disclosed they were not dairy products, through statements such as "A Vegetable Product – Contains No Milk or Milk Fat," "Non-Dairy Creamer," and "To Whiten and Enrich Coffee."

**III.   DEFENDANT'S COFFEE CREAMER MADE WITHOUT CREAM**

16.   The representations are consistent and uniform across the various flavors of Kroger coffee creamers, which include French Vanilla and Hazelnut.

17.   The front label representations include the statement of identity, "Coffee Creamer," directly above "Ultra-Pasteurized," with no mention the Product is "Non-Dairy."

 

18.   Pasteurization is defined as the process of heating something, especially milk, at a controlled temperature for a particular period of time in order to kill bacteria.

19.   Consumers have long associated pasteurization with dairy beverages, because children grow up drinking milk, especially in small school cartons.

20.   Dairy beverages are required by law to be pasteurized and to prominently disclose this on their front labels, as shown for milk and light cream.




21. By representing the Product as a "Coffee Creamer" which has been "Ultra-Pasteurized," without any "Non-Dairy" statement, consumers expect dairy ingredients.

22. However, the Product lacks cream and other dairy ingredients beyond a *de minimis* amount of sodium caseinate, a milk derivative, shown through the ingredient list.

**INGREDIENTS:** WATER, SUGAR, HIGH OLEIC SOYBEAN OIL, CORN SYRUP SOLIDS, CONTAINS LESS THAN 1% OF SODIUM CASEINATE (A MILK DERIVATIVE), DIPOTASSIUM PHOSPHATE, DATEM, POLYSORBATE 60, NATURAL AND ARTIFICIAL FLAVORS, CARRAGEENAN, MIXED TOCOPHEROLS (FOR FRESHNESS). **CONTAINS: MILK.**

23. In place of cream, the Product substitutes water and (high oleic) soybean oil, the first and third ingredients, to reduce costs.

24. The name "coffee creamer" is almost identical to "coffee cream," defined by the FDA as a dairy product, "which contains not less than 18 percent but less than 30 percent milkfat." 21 C.F.R. § 131.155(d).

25. The principal display panel of coffee cream is required to be accompanied by "[T]he word 'ultra-pasteurized' if the food has been ultra-pasteurized." 21 C.F.R. § 131.155(d)(1)(i).

26. By identifying the Product as "Coffee Creamer" that "has been ultra-pasteurized," consumers will expect dairy cream.

27. No requirement exists that a "coffee creamer" made from water and soybean oil be pasteurized nor disclose this fact to consumers.

28. Competitor products which contain the same ingredients as the Product are identified prominently as "Non-Dairy Coffee Creamer" and are not described as having been pasteurized.

29. Customers like Plaintiff chose Defendant's Coffee Creamer over substantively identical non-dairy coffee creamers, which were labeled in a non-deceptive manner.

30. Consumers, including Plaintiff, value cream over non-dairy coffee whiteners made from vegetable oils because milkfat contains hundreds of aroma compounds, or lactones, which provide its "creamy" taste.

31. Consumers, including Plaintiff, value cream over non-dairy coffee whiteners made from vegetable oils for its nutritive benefits.

32. Research indicates fats in dairy ingredients like cream do not increase the risk of cardiovascular disease or increase cholesterol, in contrast to vegetable oils like soybean oil, known for harmful trans fats.

33. Dairy ingredients like cream contains protein, calcium and vitamins A, D, E, and K, which are absent from refined and hydrogenated vegetable oils like soybean oil.

34. The Product contains other representations and omissions which are false and misleading.

35. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

36. Plaintiff paid more for the Product than she would have if she knew it did not contain cream nor any dairy ingredients beyond a negligible amount of a milk derivative, and would have paid less or not purchased it.

37. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $3.99 for 32 FL OZ (946 mL), excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## Jurisdiction and Venue

38. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

39. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

40. Plaintiff Stacy Sumner is a citizen of Illinois.

41. Defendant The Kroger Co. is an Ohio corporation with a principal place of business in Cincinnati, Ohio, Hamilton County.

42. Plaintiff's citizenship of Illinois is diverse from Defendant's.

43. The class of persons Plaintiff seeks to represent includes persons who are citizens of

different states from which Defendant is a citizen.

44. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, with the representations described here, at hundreds of stores in the States covered by Plaintiff's proposed classes.

45. The Product is available to consumers from Defendant's stores and website.

46. Venue is in this District because Plaintiff resides in this District and the actions giving rise to the claims, her purchase, consumption, reliance on the representations and omissions, and her awareness they were false and misleading, occurred within this District.

47. This action should be assigned to the Benton Division of this District because a substantial part of the events or omissions giving rise to these claims occurred in Saline County, including Plaintiff's purchase, consumption, and/or use of the Product and awareness and/or experiences of and with the issues described.

## Parties

48. Plaintiff Stacy Sumner is a citizen of Harrisburg, Saline County, Illinois.

49. Defendant The Kroger Co. is an Ohio corporation with a principal place of business in Cincinnati, Ohio, Hamilton County.

50. Defendant is the largest grocer in the United States.

51. Defendant operates thousands of Kroger grocery stores and numerous regional grocery chains in the States covered by Plaintiff's proposed classes.

52. While Kroger sells leading national brands, it also sells a large number of products under its Kroger private label brands.

53. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

54. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

55. Products under the Kroger brand have an industry-wide reputation for quality and value.

56. In releasing products under the Kroger brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

57. Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

58. That Kroger branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

59. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

60. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

61. Private label products under the Kroger brand benefit by their association with consumers' appreciation for the Kroger brand as a whole.

62. The development of private label items is a growth area for Kroger, as they select only top suppliers to develop and produce Kroger-branded products.

63. These facts show a company with a significant amount of goodwill and equity when it comes to consumer purchasing.

64. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at Defendant's stores, at locations such as U.S. Hwy

45 N, Harrisburg, IL 62946, between May and June 2022, among other times.

65. Plaintiff bought the Product because she believed and expected the Product contained cream, a dairy ingredient, because that is what the front label representations and omissions said and implied, especially because it stated "Ultra-Pasteurized" immediately below "Coffee Creamer," and nowhere on the front label did it disclose it was that it was "Non-Dairy."

66. Plaintiff prefers dairy ingredients to dairy substitutes made from vegetable oils, for reasons including a desire to avoid highly processed foods, health, and nutrition.

67. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, hang tags, and/or images on the Product, on the labeling, statements, omissions, claims, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

68. Plaintiff bought the Product at or exceeding the above-referenced price.

69. Plaintiff was damaged and injured by paying more for the Product than she would have paid or would not have purchased it had she known the representations and omissions were false and misleading.

70. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

71. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with assurances its representations are consistent with its abilities, attributes, and/or composition and there are no material omissions.

72. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar products described as containing dairy ingredients, because she is unsure whether

those representations are truthful.

## Class Allegations

73. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of South Dakota, Texas, Alabama, Tennessee, West Virginia, Mississippi, Wyoming, Utah, Nebraska, Kansas, Alaska, and Idaho who purchased the Product during the statutes of limitations for each cause of action alleged.

74. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

75. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

76. Plaintiff is an adequate representative because her interests do not conflict with other members.

77. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

78. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

79. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

80. Plaintiff seeks class-wide injunctive relief because the practices continue.

Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.

(Consumer Protection Statute)

81.     Plaintiff incorporates by reference all preceding paragraphs.

82.     Plaintiff read and relied on "Coffee Creamer" above "Ultra-Pasteurized," and did not observe any front label "Non-Dairy" statement, and believed the Product contained cream, a dairy ingredient.

83.     Plaintiff was damaged and injured by paying more for the Product than she would have paid or would not have purchased it if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(Consumer Fraud Multi-State Class)

84.     The State Consumer Fraud Acts which apply to the members of the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit unfair or deceptive practices in the conduct of commerce.

85.     The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under their State Consumer Fraud Acts and/or the consumer protection statute invoked by Plaintiff.

86.     Defendant intended that members of the Consumer Fraud Multi-State Class rely upon its deceptive conduct.

87.     As a result of Defendant's use of artifice, and unfair or deceptive acts, the members of the Consumer Fraud Multi-State Class sustained damages by paying more for the Product than they would have paid had they known the truth.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

88.  The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it contained cream, a dairy ingredient.

89.  Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

90.  Defendant knew the product attributes that potential customers like Plaintiff were seeking,

91.

92.  dairy ingredients such as cream, to add to their coffee and other foods, and developed its marketing and labeling to directly meet those needs and desires.

93.  Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it contained cream, a dairy ingredient.

94.  Defendant's representations affirmed and promised that the Product contained cream, a dairy ingredient.

95.  Defendant described the Product so Plaintiff believed it contained cream, a dairy ingredient, by prominently disclosing it was "Ultra-Pasteurized," understood by Plaintiff to be a heat sterilization process most commonly associated with dairy beverages, and failing to disclose it was "Non-Dairy" on the front label, which became part of the basis of the bargain that it would conform to its affirmations and promises.

96. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

97. This duty is based on Defendant's outsized role in the market for this type of Product, the nation's leading grocery store.

98. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

99. Plaintiff provides or will provide notice to Defendant, its agents, representatives, retailers, and their employees, that it breached the Product's express and implied warranties.

100. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, suppliers, competitors, and consumers, to its main offices, and its awareness of discussions on these issues in online forums.

101. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

102. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it contained cream, a dairy ingredient, even though it contained no cream.

103. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it contained cream, a dairy ingredient, that was "Ultra-Pasteurized," and failed to disclose it was "Non-Dairy" on the front label, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

<u>Negligent Misrepresentation</u>

104. Defendant had a duty to truthfully represent the Product, which it breached.

105. This duty was non-delegable, based on Defendant's position, holding itself out as

having special knowledge and experience in this area, the nation's leading grocer, known for its transparent labeling, and its commitment to putting customers first.

106. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

107. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

108. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

109. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

Fraud

110. Defendant misrepresented the Product as containing cream, a dairy ingredient, and compounded this by describing it as "Ultra-Pasteurized."

111. Unlike dairy beverages, there is no requirement that non-dairy beverages made from soybean oil be subjected to pasteurization nor that this fact be disclosed like it was a dairy product.

112. Defendant omitted "Non-Dairy" before "Coffee Creamer," which would have informed Plaintiff the Product did not contain cream.

113. The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception.

Unjust Enrichment

114. Defendant obtained benefits and monies because the Product was not as represented and expected, because it lacked cream and any dairy ingredients beyond a negligible amount of a

14

milk derivative, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the Class;

2. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the Class pursuant to applicable laws;

3. Restitution and disgorgement for members of the Class pursuant to applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   August 22, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com